<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-4724**

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

       v.

ERNEST HAROLD PITT,

              Defendant - Appellant.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Malcolm J. Howard, Senior District Judge.  (1:08-cr-00325-MJH-1)

Argued:  December 9, 2011               Decided:  June 1, 2012

Before TRAXLER, Chief Judge, and GREGORY and WYNN, Circuit Judges.

Vacated and remanded by unpublished opinion.  Judge Gregory wrote the opinion, in which Judge Wynn joined except as to Part II.B.  Judge Wynn wrote a separate opinion concurring in result only as to Part II.B.  Chief Judge Traxler wrote an opinion concurring in part and dissenting in part.

**ARGUED:** Christopher R. Clifton, Michael Andrew Grace, Sr., GRACE, TISDALE & CLIFTON, P.A., Winston-Salem, North Carolina, for Appellant.  Frank J. Chut, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:** Anna Mills Wagoner, United States Attorney, Greensboro, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

In this case, appellant Harold Pitt challenges his convictions for mail fraud in connection with a real estate sale on grounds that the district court improperly denied his motion for judgment of acquittal and that the jury instructions were improper under Skilling v. United States, 130 S. Ct. 2896 (2010). Finding that that the jury instructions were plainly erroneous, we vacate his convictions.

I.

Harold Pitt was the chairman of the board of the Housing Authority of Winston-Salem ("HAWS"), a public body created by the North Carolina legislature as a municipal corporation. HAWS's purpose is to provide public housing for the Winston-Salem area. The members of the board are appointed by the mayor of Winston-Salem, and the board then elects its chairman. The board's role is very similar to that of a board of directors of a corporation: each member takes an oath of office administered by the mayor and is a fiduciary of HAWS. The members also serve as members of the board of Forsyth Economic Venture ("FEV"), a non-profit organization that is owned and controlled by HAWS. North Carolina state law prohibits housing authority commissioners from acquiring an interest in a housing project or property planned to be included in any project. N.C. GEN. STAT.

2

§ 157-7. The statute also provides a duty to disclose any conflict of interest. Id. HAWS receives the majority of its funding from the U.S. Department of Housing and Urban Development ("HUD").

Pitt and his business partner Thomas Trollinger formed a limited liability partnership known as East Pointe Developers ("EPD"). EPD purchased a 41-lot subdivision known as Lansing Ridge and built low-income housing on 18 of those lots, leaving 23 undeveloped. Eventually, EPD sold the undeveloped lots to another entity, Wolfe Investment ("Wolfe"), for $358,000. Two hundred forty-nine thousand dollars was borrowed from a trust fund, secured by a first deed of trust. EPD provided the remaining $183,000, taking a second deed of trust in that amount. Wolfe, however, failed to develop Lansing Ridge. Pitt informed Wolfe that HAWS might be interested in purchasing the property and advised Wolfe not to sell to anyone else before HAWS made a decision. Around the same time, the HAWS board met and Pitt, without disclosing EPD's interest in Lansing Ridge, moved to authorize the executive director of HAWS to enter into negotiations to purchase the property to develop low-income housing. The board approved the resolution.

A foreclosure proceeding was brought by the trust fund holding the first deed of trust. Foreclosure on the first deed would have extinguished the second deed held by EPD. Pitt,

3

Trollinger, and EPD's attorney, Andrew Hart, met to discuss the situation. They agreed that Trollinger would purchase Lansing Ridge at the foreclosure sale and then sell the property to HAWS. Trollinger, as the only bidder, successfully bid $285,100. He later assigned his bid to EPD, ostensibly to avoid capital gains tax. Afterward, EPD borrowed $220,000 from Branch Bank and Trust ("BB&T") to pay for the purchase; Pitt and Trollinger also individually contributed personal funds -- $29,050 and $14,795 respectively.

EPD then sold Lansing Ridge to FEV, the wholly owned subsidiary of HAWS, for $414,000. At the closing, Trollinger was given a check for $413,172, made payable to EPD. Pitt took the check from Trollinger and deposited it in EPD's account at BB&T. The proceeds were used to pay off EPD's loan to purchase Lansing Ridge; Pitt and Trollinger then distributed the remainder to themselves, $84,000 to each.

HAWS's board was not aware of the purchase of Lansing Ridge, nor did it seek approval from HUD prior to the sale, as is custom. HAWS did eventually submit an acquisition package to HUD, but HUD denied the acquisition request on two independent grounds: the land was not suitable for development,[1] and HUD

---

[1] While the dissent asserts that Lansing Ridge "was not well-suited for use as an affordable-housing development," the evidence is decidedly mixed on that question. One of the
(Continued)

4

discovered that Pitt had a conflict of interest. HUD's denial barred the use of federal funds to develop the property. After Pitt's conflict of interest was discovered, he resigned as chairman of the board. As a result of the lack of HUD funding, HAWS had to use non-federal development fees to retire its debt.

Pitt was indicted on one count of wire fraud, four counts of financial transactions in a criminally deprived property, and two counts of mail fraud in violation of 18 U.S.C §§ 1341 & 1346. He was tried on all counts but found guilty only of the two counts of mail fraud. The jury did not reach a verdict on the remaining counts.

## II.

Pitt challenges his conviction on two grounds. He contends that the district court improperly denied his Rule 29 motion for a judgment of acquittal and that the jury instructions were in error under the Supreme Court's recent decision in <u>Skilling v. United States</u>. We address each claim of error in turn.

---

Government's own witnesses, Janet DeCreny, testified that apart from Pitt's conflict of interest, the property was usable for Hope VI. J.A. 861. Several Government witnesses testified that while the land would need work before it was construction-ready, it could be used for a housing development project. J.A. 208 (testimony of Jeff Corbett); J.A. 831-35 (testimony of David MacPherson); J.A. 861-70 (testimony of Janet DeCreny).

A.

Pitt first alleges that there was insufficient evidence for the jury to have convicted him of mail fraud. We disagree.

When an appellate court reviews the denial of a motion for judgment of acquittal, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (citing <u>Johnson v. Louisiana</u>, 406 U.S. 356, 362 (1972)). There are two elements of mail fraud: "(1) the existence of a scheme to defraud [money or property or honest services][2] and (2) the use of the mails . . . for the purpose of executing the scheme." <u>United States v. Delfino</u>, 510 F.3d 468, 471 (4th Cir. 2007). To establish the first element, the Government "must prove that the defendants acted with the specific intent to defraud, which may be inferred from the totality of the circumstances and need not be proven by direct evidence." <u>United States v. Godwin</u>, 272 F.3d 659 (4th Cir. 2001) (citations omitted). Fraud includes "acts taken to

---

[2] While a defendant may be convicted under an honest services or pecuniary theory of fraud, here we evaluate the sufficiency-of-the-evidence claim under a pecuniary theory only: the Supreme Court's recent decision in <u>Skilling v. United States</u>, 130 S. Ct. 2896 (2010), requires proof of a bribery or kickback scheme to make out a case for honest services fraud, and there is no indication Pitt engaged in either.

6

conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other [party] from acquiring material information." United States v. Colton, 231 F.3d 890, 898 (4th Cir. 2000) (citing RESTATEMENT (SECOND) OF TORTS § 550 (1977)). "Thus, fraudulent concealment -- without any misrepresentation or duty to disclose -- can constitute . . . fraud." Id. at 899.

Pitt first argues that the evidence was insufficient to prove that he concealed his conflict of interest. The evidence at trial, however, was sufficient for a reasonable jury to find otherwise. Prior to the sale, Pitt told another individual, Jeff Corbett, that he could not develop the Lansing Ridge property with federal funds because he had a conflict of interest. Moreover, North Carolina state law provides that "If any commissioner or employee of an authority owns or controls an interest . . . in any property included or planned to be included in any housing project, he shall immediately disclose the same in writing to the authority and such disclosure shall be entered upon the minutes of the authority. N.C. GEN. STAT. § 157-7. Pitt, however, failed to comply with this obligation. Trollinger also testified that he and Pitt agreed that Trollinger would purchase the property in his own name, rather than EPD's, to conceal Pitt's conflict of interest.

7

Pitt next argues that there is insufficient evidence he had the requisite intent. But again, the evidence at trial was sufficient for a reasonable jury to find he had the intent to defraud HAWS of a pecuniary interest. When Wolfe was first contemplating selling off Lansing Ridge, Pitt spoke with Wolfe and suggested that HAWS might purchase the property; once the foreclosure action commenced, Pitt and Trollinger agreed that they would bid at the auction and then re-sell the property to HAWS, thereby making a substantial profit. Moreover, as discussed above, Pitt consummated the sale while concealing his conflict of interest. A reasonable jury could infer from these facts that Pitt intended to defraud HAWS of the Lansing Ridge purchase money.

As to the second element of mail fraud, Pitts does not challenge that he used the U.S. mails in connection with the land sale as to each of the counts of which he was convicted. We therefore reject Pitt's argument that insufficient evidence was presented at trial to convict him.

B.

Pitt goes on to suggest that the instructions given to the jury were erroneous under Skilling v. United States, 130 S. Ct. 2896, 2931 (2010), and that he is entitled to a reversal of his conviction. We agree.

8

1.

In Skilling, the Supreme Court considered the constitutionality of 18 U.S.C. § 1346, which defines the term "scheme or artifice to defraud" to "include a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346 (1988). In Skilling, the Court limited the reach of § 1346, holding that "honest services fraud" only covers bribery and kickback schemes. Skilling, 130 S.Ct. at 2931. Because the defendant in that case was convicted by a general verdict after the jury was instructed on alternative theories of guilt -- one valid, and one invalid -- the Court reversed the conviction. Id. at 2934 (citing Yates v. United States, 354 U.S. 298, 312 (1957) ("[A] verdict [must] be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected.").

Skilling is applicable to cases on direct appeal, Griffith v. Kentucky, 479 U.S. 314, 328 (1987), and the district court did instruct the jury that it could convict on either a deprivation-of-property or an honest-services theory of fraud. When the district court instructed the jury on the honest-services theory, it did not include, as Skilling now requires, an instruction limiting application of that theory to bribery or kickback schemes. Moreover, the Government did not allege that

9

Pitt accepted a side payment.  Thus, as the Government concedes, there was error and, moreover, Pitt "did not commit honest services fraud."  Skilling, 130 S. Ct. at 2934.

2.

The mere fact that the jury instructions were erroneous, however, does not end the inquiry.  If a defendant fails to object to an erroneous jury instruction at trial, Rule 52(b) would apply and this Court would review only for plain error. FED. R. CRIM. P. 52(b).  We note first that Skilling was not handed down until long after Pitt's trial -- indeed, both parties filed their briefs in this Court months before Skilling was decided.[3]  That is, Pitt had no way of knowing at trial that the proposed jury instructions were in fact contrary to law. However, the Supreme Court has held that Rule 52(b) applies even in cases where the relevant rule of law was not established until after trial.  Johnson v. United States, 520 U.S. 465, 464-66 (1997).  We must, therefore, apply plain error here.  To demonstrate plain error, the appellant must show that (1) there was error, (2) the error was plain, (3) the error affected his substantial rights, and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial

---

[3] As a result, we ordered the parties to file supplemental briefs addressing the Skilling issue.

10

proceedings, or the defendant is actually innocent. United States v. Cedelle, 89 F.3d 181, 184 (4th Cir. 1996) (citing United States v. Olano, 507 U.S. 725, 731-37 (1993)). With respect to Yates errors in particular, this Court has held that a defendant who fails to preserve his objection to a flawed instruction "must demonstrate that the erroneous instruction given resulted in his conviction, not merely that it was impossible to tell under which [theory] the jury convicted." United States v. Robinson, 627 F.3d 941, 954 (4th Cir. 2010).

The first two Olano prongs are clearly satisfied. As the Government concedes, there was error: the district court improperly instructed the jury as to the honest services fraud count. Moreover, this error is plain: Skilling straightforwardly holds that such jury instructions are improper. That it was not plain at the time of trial is immaterial; the Supreme Court held in Johnson that "in a case . . . where the law at the time of trial was settled and clearly contrary to the law at the time of appeal[,] it is enough that an error be 'plain' at the time of appellate consideration." Johnson, 530 U.S. at 468.

We further find that the error substantially affected Pitt's rights. Generally, for an error to affect a defendant's substantial rights, it "must have been prejudicial: It must have affected the outcome of the district court proceedings." Olano,

11

507 U.S. at 734. The defendant must "show a reasonable probability that, but for the error," the outcome would be different. United States v. Dominguez Benitez, 542 U.S. 74, 76 (2004). Here there is every reason to believe that the outcome would have been different had the district court properly instructed the jury. From start to finish, the Government's case revolved around honest services fraud. The theory of the prosecution's case was that Pitt abused his position as the chairman of HAWS and deprived the public of his honest services by failing to disclose that he had a conflict of interest in the Lansing Ridge sale. In its closing, the Government argued, "The heart of this case is this idea of public duty. It's called in the federal criminal statutes [*sic*] that the judge is going to instruct you on honest services, the duty of honest services." J.A. 1260. It went on to say that it need not prove Pitt engaged in pecuniary fraud to get a conviction. E.g., J.A. 1262-63, 1281-82, 1313-14. The deprivation of honest services, the Government informed the jury, was all it needed to find Pitt guilty.

> If instead, the official or employee acts or makes a decision based on a personal interest . . . , the official or employee has violated the duty to provide honest services to the public even though the public agency involved may not suffer any loss . . . The crime is the violation of the duty.

J.A. 1262.

12

Further, when the district court charged the jury, it spent a substantial amount of time explaining the now-invalid honest service theory.  E.g., J.A. 1339-40.  In contrast, the district court mentioned only once the still-valid pecuniary fraud theory.  J.A. 1338.

While the Government correctly notes it argued at trial that Pitt received a monetary benefit from the Lansing Ridge sale, those allegations were wrapped up in the honest services theory of the case.  The Government argued that, in order to receive a personal benefit, Pitt defrauded HAWS of its right to his honest services.  E.g., J.A. 1263, 1264, 1267, 1269-70, 1285-86, 1314.  The pecuniary interest, in other words, was offered primarily as a motive to engage in honest-services fraud rather than as an independent theory of guilt.

We also note the jury's failure to convict Pitt on the additional counts on which he was indicted.  Pitt was indicted and tried on several additional charges of wire fraud and money laundering -- counts that involved financial transactions. Although these additional counts specifically involved the transfer of funds, the jury could not reach a verdict.  This contrasts starkly with other cases, cited by our fine colleague in dissent, in which contemporaneous convictions on additional and related charges ameliorated the problem of the infirm honest services charge.  For example, in United States v. Jefferson,

13

674 F.3d 332 (4th Cir. 2012), this Court was also confronted with a Skilling problem in a jury charge, for conspiracy to commit honest services wire fraud. In that case, however, the jury also convicted the defendant of two substantive bribery offenses, and the circumstances surrounding the bribery offenses and the conspiracy were the same.

Our conclusion is buttressed by the fact that an honest-services theory and a pecuniary theory of mail fraud have different elements with respect to intent. As noted above, there are two elements of mail fraud: "(1) the existence of a scheme to defraud [money or property or honest services] and (2) the use of the mails . . . for the purpose of executing the scheme." Delfino, 510 F.3d at 468. To establish the first element, the Government "must prove that the defendants acted with the specific intent to defraud . . . ." Godwin, 272 F.3d at 659 (citations omitted). Under an honest-services theory, the Government need only show the defendant had the intent to defraud another of the intangible right of honest services. United States v. Harvey, 532 F.3d 326, 333 (4th Cir. 2008). In a pecuniary fraud theory, by contrast, the Government must prove the defendant intended to deprive another of a pecuniary interest. See United States v. United Med. & Surgical Supply Corp., 989 F.2d 1390 (4th Cir. 1993). As a result, an honest-service fraud conviction does not necessitate a pecuniary fraud

14

conviction. Here, the fact that the jury found Pitt intended to defraud HAWS of its right to his honest services does not compel the conclusion that he also intended to deprive HAWS of a pecuniary interest.

Finally, we exercise our discretion to notice the error by finding that the erroneous jury instructions seriously affected the fairness, integrity, or public reputation of the judicial proceedings. In this case, the district court's instructions to the jury were clearly erroneous. Had the jury been properly instructed, the outcome would not merely have been different, but Pitt likely would have been found not guilty of the charges brought against him. He instead was branded as a felon and is forced to endure "the official expression of society's condemnation of his conduct." United States v. Turner, 532 F.Supp. 913, 915 (N.D. Cal. 1982). Moreover, as Skilling makes clear, any jury instruction that fails to properly limit the reach of honest services fraud to bribery or kickback schemes runs afoul of the Due Process Clause, depriving the defendant of his constitutional rights. See Skilling, 130 S. Ct. at 2927-35. If the Government remains convinced that Pitt is guilty, it can choose to retry him pursuant to a proper jury instruction. But to uphold the conviction in light of the facts presented here would be nothing less than a "miscarriage of justice." Cedelle, 89 F.3d at 184.

15

Having found that the faulty jury instructions constituted plain error, we are compelled to vacate both of Pitt's convictions. The two convictions rely on the same underlying scheme to defraud -- EPD's sale of the Lansing Ridge property to HAWS. The only difference between the two involves what documents Pitt caused to be sent through the U.S. mails: while Count Six alleges that it was "closing documents," Count Seven asserts it was "loan documents regarding a loan between M&F Bank and FEV." Because sending documents through the U.S. mails is not a federal crime unless it is done in the context of an underlying fraud, both convictions must be vacated.

## III.

While the district court did not err in denying the Appellant's Rule 29 motion, we find that the jury instructions were plainly erroneous. We therefore vacate the Appellant's convictions and remand to the district court for further proceedings.

<u>VACATED AND REMANDED</u>

WYNN, Circuit Judge, concurring in result only as to Part II.B.:

Defendant Harold Pitt challenges his convictions for mail fraud in connection with a real estate sale, arguing that the jury instructions were improper under Skilling v. United States, 130 S. Ct. 2896 (2010). Because I agree that the instructions were indeed plainly erroneous, I, too, conclude that Defendant's convictions must be vacated.

I.

18 U.S.C. § 1341 prohibits the use of the mail to further "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . ." 18 U.S.C. § 1346 defines "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services."

In Skilling, the Supreme Court held that "honest services fraud" covers only bribery and kickback schemes. Skilling, 130 S. Ct. at 2928, 2931. In so doing, the Supreme Court rejected the argument that "honest services" should encompass conflict-of-interest cases involving "undisclosed self-dealing by a public official or private employee—*i.e.*, the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." Id. at 2932 (quotation

17

marks omitted).  Because the defendant in Skilling had been convicted by a general verdict after the jury was instructed on alternative theories of guilt, one of which was invalid, the Supreme Court reversed the conviction.  Id. at 2934 (citing Yates v. United States, 354 U.S. 298, 312 (1957) ("[A] verdict [must] be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected.")).

Skilling applies to this case.  While it postdates Defendant's trial, it was decided during the pendency of his direct appeal and thus before his case was final.  See Griffith v. Kentucky, 479 U.S. 314, 328 (1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final . . . .").

Defendant's indictment did not allege, and the Government did not present any evidence, that Defendant participated in any bribery or kickback schemes.  Further, the district court instructed the jury that it could convict Defendant on an honest services theory of fraud without limiting the application of that theory to bribery or kickback schemes.  In so doing, the district court erred.  See Skilling, 130 S. Ct. at 2928, 2931. And because the jury returned a general verdict, one cannot

18

easily discern whether the verdict rested on the invalid honest services theory or on the valid pecuniary fraud theory.

When a jury is instructed on alternative theories of criminal liability and returns a general verdict of guilty that might have rested on an invalid theory, it constitutes constitutional error. See Yates, 354 U.S. at 311-12. While Defendant's convictions suffer from such error, "errors of the Yates variety are subject to harmless-error analysis." Skilling, 130 S. Ct. at 2934. Generally, to determine whether a Yates error is harmless, "the relevant appellate inquiry is whether the error was harmless beyond a reasonable doubt." United States v. Jefferson, 674 F.3d 332, 361 (4th Cir. 2012).

However, Rule 30 of the Federal Rules of Criminal Procedure mandates that "[a] party who objects to any portion of the instructions . . . must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d). Rule 30 is mitigated by Rule 52, which allows this Court to nevertheless review for plain error. Fed. R. Crim. P. 52(b). Because Skilling was not handed down until after Defendant's trial, Defendant, not surprisingly, failed to object to the now-clearly erroneous honest services instruction. Nevertheless, the Supreme Court has held that the plain error standard applies even in cases where the relevant rule of law was not established

19

until after trial.  See Johnson v. United States, 520 U.S. 461, 464-66 (1997).  We must, therefore, review this issue through the plain error lens.

To demonstrate plain error, an appellant must show that (1) there was error, (2) the error was plain, (3) the error affected his substantial rights, and (4) the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings.  Id. at 467 (citing United States v. Olano, 507 U.S. 725, 732 (1993)).  And as to Yates errors specifically, this Court has held that a defendant who failed to preserve his objection to a flawed instruction "must demonstrate that the erroneous instruction given resulted in his conviction, not merely that it was impossible to tell under which [theory] the jury convicted."  United States v. Robinson, 627 F.3d 941, 954 (4th Cir. 2010) (quotation marks and alterations omitted).

## II.

Applying the law to this case, Defendant has met the first two Olano prongs.  The district court improperly instructed the jury as to honest services fraud.  Further, that error is plain: Skilling makes clear that jury instructions such as those given here, which allow a jury to convict under an honest services theory in the absence of bribery or kickbacks, are constitutionally infirm.  Skilling, 130 S. Ct. at 2931.  That

20

the error may not have been plain at the time of trial is irrelevant: "[W]here the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error be 'plain' at the time of appellate consideration." Johnson, 520 U.S. at 468.

Further, the error substantially affected Defendant's rights. Generally, for an error to affect a defendant's substantial rights, it "must have been prejudicial: It must have affected the outcome of the district court proceedings." Olano, 507 U.S. at 734. Further, because we are limited to reviewing for plain error, Defendant must show that "the erroneous instruction given resulted in his conviction . . . ." Robinson, 627 F.3d at 954 (quotation marks and alterations omitted).

I believe that the erroneous instruction indeed resulted in Defendant's conviction. The Government's case focused on honest services fraud, and specifically the theory that Defendant abused his position as the chairman of HAWS and deprived the public of his honest services by failing to disclose that he had a conflict of interest in the Lansing Ridge sale. In its closing argument, the Government plainly stated that "[t]he heart of this case is this idea of public duty. It's called in the federal criminal statutes that the judge is going to instruct you on honest services, the duty of honest services."

21

J.A. 1260. The Government then repeatedly told the jury that the Government did not need to prove that Defendant engaged in pecuniary fraud to get a conviction. For example, the Government told the jury:

> Public officials and public employees inherently owe a duty to the public to act in the public's best interest and Judge Howard, when he reads the instructions, he will say, if instead, the official or employee acts or makes a decision based on personal interest such as receiving a personal benefit from an undisclosed conflict of interest, the official or employee has violated the duty to provide honest services to the public even though the public agency involved may not suffer any monetary loss in the transaction. The crime is the violation of the duty.

J.A. 1262. This contrasts starkly with Skilling, in which the Government "mentioned the honest-services theory in relation to Skilling only once"—in its rebuttal closing argument—and "never argued that the jury should convict Skilling solely on the honest-services theory . . . ." United States v. Skilling, 638 F.3d 480, 483 (5th Cir. 2011).

Further, and crucially, when the district court actually charged the jury here, it spent a substantial amount of time explaining to the jury the now-invalid honest services theory. By contrast, the district court barely mentioned the still-valid pecuniary fraud theory—together with a mention of the now-invalid honest services theory:

> [F]or you to find Mr. Pitt guilty of mail fraud in count six or seven, you must be convinced that the government has proved each element beyond a reasonable

22

> doubt:   First,  that  Mr. Pitt  knowingly  devised  or
> participated  in  a  scheme  to  fraudulently  deprive  the
> public  and  the  Housing  Authority  of  Winston-Salem  of
> money,  property,  or  of  the  intangible  right  of  honest
> service . . . .

J.A. 1338.

Nowhere in its charge did the district court explain or expound upon, in conjunction with the mail fraud counts, the pecuniary fraud theory.

Moreover, while Defendant was indicted and tried on multiple other charges for wire fraud and money laundering, he was not convicted on a single one. On all of those other counts, which specifically involved the transfer of funds, the jury could not reach a verdict. That contrasts starkly with cases cited by the dissent, in which contemporaneous convictions on additional and related charges ameliorated the problem of the infirm honest services charge. For example, in Jefferson, 674 F.3d 332, this Court confronted a Skilling problem in a jury charge for conspiracy to commit honest services wire fraud. But because the jury had also convicted the defendant on two bribery counts, and the circumstances surrounding the bribery offenses and the conspiracy were the same, the Skilling error was harmless. Id. at 362.

Similarly, in United States v. Hastings, 134 F.3d 235, 242 (4th Cir. 1998), also a plain error case, this Court emphasized that "[a] reviewing court must attempt to ascertain what

23

evidence the jury necessarily credited in order to convict the defendant under the instructions given. If that evidence is such that the jury must have convicted the defendant on the legally adequate ground in addition to or instead of the legally inadequate ground, the conviction may be affirmed." The Court then determined that "in making the factual finding necessary to convict under the erroneous instruction, the jury necessarily found facts establishing" the elements of the validly instructed offense. Id. Under such circumstances, this Court held that the defendant could not establish plain error. Id. See also United States v. Rodrigues, ___ F.3d ___, 2012 WL 1001349, at *8 (9th Cir. 2012) ("[T]he Court determines that in light of the jury's verdict, as affirmed by the Ninth Circuit, it is clear that the jury had to have found that Petitioner engaged in a kickback scheme."); United States v. Coppolla, 671 F.3d 220, 238 n.12 (2d Cir. 2012) (deeming Yates error "harmless under any conceivable standard" where proof of the invalid theory "necessarily establishes the facts required to show" the valid theory).

While the Hastings jury's conviction necessarily captured the factual findings needed for a valid conviction, the same cannot be said in this case. Indeed, the jury was told repeatedly that it need not find pecuniary fraud to convict

Defendant of the mail fraud charges—and nothing indicates that the jury made any such pecuniary fraud finding.

This case also contrasts starkly with United States v. Joshua, 648 F.3d 547 (7th Cir. 2011), also cited in the dissent. In Joshua, "special verdicts unambiguously reveal[ed] that the jury accepted both of the prosecution's theories: honest services fraud, and a conventional fraudulent scheme to obtain money. The latter form of mail fraud is untouched by Skilling and remains illegal. Thus, even if honest services fraud is erased from the picture, the jury would have convicted on the monetary fraud theory." Id. at 553 (citation omitted). Here, by contrast, there were no special verdicts, and nothing indicates that the jury would have convicted Defendant on a pecuniary fraud theory.

On the contrary, the jury was repeatedly told that it need not worry about pecuniary fraud to convict Defendant of mail fraud. The jury was then barely instructed on pecuniary fraud as to the mail fraud charges. Instead, it was instructed extensively on the now-defunct honest services theory and told that a conflict of interest was enough to convict. The jury proceeded to convict Defendant of only mail fraud and not of any of the other charges, all of which involved financial transactions. And substantial evidence before the jury spoke to Defendant's conflict of interest, regardless of whether he

25

defrauded HAWS or anyone else of money or property. For example, trial testimony made clear that: Defendant, who served as chairman of the HAWS Board of Commissioners, was a fiduciary and had an obligation to disclose conflicts of interest and avoid acquiring an interest in a housing project; Defendant moved to authorize HAWS to enter into negotiations to purchase Lansing Ridge without disclosing his interest in that property or his role in EPD; and Defendant allowed the Lansing Ridge purchase to occur without informing anyone of his conflict or even securing HAWS board approval for the purchase or the related loans. Under all of these circumstances, I conclude that the third Olano prong is met, that the jury convicted Defendant on the defunct honest services theory, and that the related instructional error affected Defendant's substantial rights.

Finally, regarding the fourth Olano prong, I believe that the plainly erroneous jury instructions seriously affected the fairness and integrity of Defendant's judicial proceedings. Indeed, as Skilling indicates, any jury instruction that fails to properly limit the reach of honest services fraud to bribery or kickback schemes runs afoul of the Due Process Clause, depriving a defendant of his constitutional rights. See Skilling, 130 S. Ct. 2896.

26

III.

In sum, the district court committed plain (even if, at the time, understandable) error when it instructed the jury that it could convict Defendant of mail fraud based on an honest services theory in the absence of allegations and evidence of bribes or kickbacks. I therefore agree that Defendant's mail fraud convictions must be vacated.

TRAXLER, Chief Judge, concurring in part and dissenting in part:

I agree that the evidence was sufficient to support Pitt's mail fraud convictions, and I therefore concur in Section II.A of the majority opinion. I likewise agree that the district court's jury instructions, though proper when given, were improper in light of the Supreme Court's opinion in Skilling v. United States, 130 S. Ct. 2896 (2010). I am convinced, however, that the Skilling error was harmless beyond a reasonable doubt, and I therefore dissent from the reversal of Pitt's convictions.

I.

18 U.S.C.A. § 1341 prohibits use of the mails to further "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C.A. § 1346 defines "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services." In Skilling, the Supreme Court held that, to avoid constitutional questions of vagueness, honest-services fraud under § 1346 must be limited to the conduct at the core of the doctrine as historically applied: "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." Skilling, 130 S. Ct. at 2928. In so limiting § 1346, the Court specifically

28

rejected the argument that the honest-services doctrine should encompass conflict-of-interest cases -- those involving "undisclosed self-dealing by a public official or private employee" or "the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." Id. at 2932 (internal quotation marks omitted).

The indictment in this case alleged that Pitt and his co-defendants devised a scheme to defraud the Housing Authority of Winston-Salem ("HAWS") and the public of both the $414,000 in HAWS funds used to buy Lansing Ridge and Pitt's honest services. The honest-services theory, however, should not have been submitted to the jury because there were no allegations in the indictment or evidence at trial of bribes or kickbacks. And because the jury returned a general verdict, we cannot determine whether the verdict rested on the (now) invalid honest-services theory or on the (still) valid pecuniary fraud theory.

Constitutional error arises when a jury is instructed on alternative theories of criminal liability and returns a general verdict of guilty that might have rested on a theory that was invalid as matter of law. See Yates v. United States, 354 U.S. 298, 311-12 (1957). While Pitt's convictions are "flawed" by

29

the Yates error, "errors of the Yates variety are subject to harmless-error analysis."  Skilling, 130 S. Ct. at 2934.

To determine whether a Yates alternative-theory error is harmless, "the relevant appellate inquiry is whether the error was harmless beyond a reasonable doubt."  United States v. Jefferson, 674 F.3d 332, 361 (4th Cir. 2012).  "Accordingly, a reviewing court is not entitled to reverse a conviction that could rest on either a valid or invalid legal theory if the court can conclude 'beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" Id. (quoting Neder v. United States, 527 U.S. 1, 18 (1999)).

Because Pitt did not argue below that § 1346 was unconstitutionally vague or object to the mail-fraud instructions when given, his Skilling claim must be viewed through the prism of plain-error review, as the majority concludes.  The primary difference between harmless-error review and plain-error review, of course, is the allocation of the burden of persuasion.  Under harmless-error review, the government bears the burden of establishing that the error was not prejudicial; under plain-error review, the defendant bears the burden establishing that he was prejudiced by the complained-of error.  See United States v. Olano, 507 U.S. 725, 734 (1993).

This court has held that to prevail on a Yates claim under plain-error review, the defendant "must demonstrate that the erroneous instruction given resulted in his conviction, not merely that it was impossible to tell under which [theory] the jury convicted." United States v. Robinson, 627 F.3d 941, 954 (4th Cir. 2010) (internal quotation marks and alterations omitted). Because I believe that Pitt's claim fails even under the more generous (to Pitt) standards of harmless-error review, I will analyze Pitt's claims under the harmless-error standard rather than the much stricter plain-error standard set out in Robinson.

## II.

Determining whether a Yates or other instructional error was harmless requires an examination of the evidence presented at trial and the district court's instructions to the jury. See, e.g., United States v. Hornsby, 666 F.3d 296, 305-06 (4th Cir. 2011). Accordingly, I will first set out the relevant facts (in a bit more detail than is contained in the majority opinion) before explaining why I believe the error was harmless beyond a reasonable doubt.

### A.

Pitt was appointed to the HAWS Board of Commissioners in 1998, and he served as Board chairman during the time period

31

relevant to this appeal. Board commissioners, as fiduciaries, are obligated to serve the interests of HAWS, and they may not use their positions to serve their own interests. North Carolina law specifically prohibits housing authority commissioners from acquiring an interest in any housing authority project or property to be included in any such project, see N.C. Gen. Stat. § 157-7, and it requires any commissioner who already has an interest in property being considered for a housing project to immediately disclose his interest to the authority in writing, see id.

HAWS receives almost all of its funding from the Department of Housing and Urban Development ("HUD"), and its use of those funds are governed by "Annual Contribution Contracts" between HAWS and HUD. The annual contracts -- which were signed by Pitt during his tenure as chairman -- contain a conflict-of-interest clause that prohibited HAWS from entering into contracts for projects in which former or current HAWS Board members had a direct or indirect interest.

Pitt and co-defendant Thomas Trollinger, through their limited-liability company known as East Pointe Developers ("EPD"), owned Lansing Ridge, a 41-lot subdivision in east Winston-Salem. EPD had built low-income housing on 18 lots, leaving 23 undeveloped lots. In April 2002, when he was serving as Chairman of HAWS, Pitt met with Jeff Corbett, owner of Wolfe

32

Investments, to discuss a sale of Lansing Ridge. According to Corbett, Pitt told him that because of an unexplained (to Corbett) "relationship" with HAWS, Pitt had a conflict-of-interest that prevented him from developing the remaining lots at a profit. J.A. 207. Pitt, however, claimed that he could provide Corbett with buyers who had been pre-qualified through a HAWS program, a promise that made Lansing Ridge attractive to Corbett. Wolfe agreed to buy the 23 undeveloped lots for $358,000. To finance the purchase, Wolfe borrowed $249,000 from a trust fund, which held a first-priority deed of trust to secure the loan. EPD provided seller-financing for the remaining portion of the purchase price and also made a separate $75,000 loan, securing both by a second-priority deed of trust in the amount of $183,000.

Pitt did not refer buyers as promised, and Wolfe was unsuccessful in developing the Lansing Ridge property. When Corbett told Pitt that he was having difficulty making the mortgage payments and needed to sell the property, Pitt told Corbett not to sell to a third party and that HAWS might be interested in purchasing Lansing Ridge.

At an October 2002 meeting of the Board, Pitt introduced a resolution authorizing the executive director to enter into negotiations to buy the Lansing Ridge lots for development under HUD's "Hope VI" housing program. Pitt did not disclose his

33

interest in Lansing Ridge or his role as a partner in EPD at that meeting, and the Board approved the resolution. The resolution authorized negotiations only; the property could not be purchased without further authorization from the Board.

Reid Lawrence, HAWS' executive director and one of Pitt's co-defendants, began negotiating with Corbett for the purchase of Lansing Ridge. In May 2003, Corbett and HAWS entered into a contract giving HAWS a 120-day exclusive option to purchase the Lansing Ridge lots for $414,000. The option contract was not presented to the Board for approval, nor was the Board otherwise given an opportunity to consider the proposed purchase.

Before HAWS acted on the option, a foreclosure proceeding was commenced by the trust fund holding the first deed of trust on the Lansing Ridge lots. Because foreclosure on the senior deed of trust would extinguish all junior liens, EPD's attorney advised Pitt and Trollinger to bid for the lots at the foreclosure sale to protect EPD's $183,000 interest in Lansing Ridge.

Shortly thereafter, Pitt, Trollinger, and Lawrence agreed that Trollinger would purchase the Lansing Ridge lots at the foreclosure sale and that HAWS would then buy the lots from Trollinger for $414,000. The parties agreed that Trollinger would buy the property in his own name rather than in EPD's name

34

so as to conceal Pitt's interest in the property. Trollinger understood that HAWS would not bid on the property at the sale.

The foreclosure sale was held on July 30, 2003. Trollinger and Lawrence were both present at the sale, but Trollinger was the only bidder at the sale. His successful bid was $285,100 -- $100 over the amount owed on the first deed of trust. To finance the purchase, EPD obtained a short-term loan of $220,000, and Pitt and Trollinger individually contributed the balance of the purchase price.

Trollinger's $285,100 bid became final on August 12, 2003, after expiration of the ten-day "upset bid" period. Less than a week later, HAWS was under contract to buy the property for $414,000. The foreclosure sale of Lansing Ridge to Trollinger was finalized on August 27, 2003; the next day, Trollinger sold Lansing Ridge to Forsyth Economic Venture ("FEV"), a wholly-owned subsidiary of HAWS. As chairman of the HAWS Board, Pitt also served as FEV's president; Lawrence, HAWS' executive director, also served as FEV's vice-president.

Trollinger and Lawrence both attended the closing of the sale to FEV. Trollinger informed the attorney handling the closing that he had assigned his foreclosure bid to EPD.[1]

---

[1] Trollinger testified that he assigned his winning foreclosure bid to EPD without Pitt's knowledge, so as to avoid capital gains taxes after the resale of the property to HAWS. (Continued)

Although Pitt was an equal partner with Trollinger in EPD, Trollinger told the closing attorney that he was EPD's sole member. The attorney made the necessary changes in the documents and proceeded to close the sale. She testified, however, that she would not have continued with the closing if she had known about Pitt's interest in the lots. Pitt and Trollinger used the proceeds from the sale to satisfy the short-term loan taken out by EPD and then distributed the remainder to themselves, with each one writing a check to the other for $84,000.

The funds used to buy Lansing Ridge had been loaned to FEV by HAWS and were wired, at Lawrence's direction, from HAWS' general account to the closing attorney. At the time of the wire transfer, the general account contained primarily federal funds. A few months after closing, Pitt obtained a commercial loan on FEV's behalf and used the proceeds of that loan to repay HAWS for the funds advanced at closing. The Board never authorized the purchase of the Lansing Ridge lots, nor did the Board authorize the various loan transactions used to structure the purchase.

---

Trollinger testified that Pitt was not happy when he learned of the assignment.

The government's evidence established that Lansing Ridge property was not well-suited for use as an affordable-housing development. Among other things, the property was poorly graded, and extensive remediation of low-lying, poorly draining land would be required for some of the lots to be "buildable." J.A. 835. As of the time of Pitt's trial, HAWS had made five unsuccessful attempts to sell the property.

Pitt's interest in Lansing Ridge came to light in December 2004, after Lawrence sought HUD approval to use the property in the Hope VI program. HUD discovered Pitt's conflict of interest while reviewing the request, and HUD thereafter refused to waive the conflict of interest and denied approval for the property. The effect of HUD's denial was to preclude HAWS from using any federal housing funds to develop or maintain Lansing Ridge. Pitt resigned from the Board in January 2005 after being questioned about his conflict of interest by a HAWS attorney.

The government charged Pitt, Trollinger, and Lawrence in a ten-count indictment; Trollinger and Lawrence pleaded guilty, and Pitt proceeded to trial. The indictment charged Pitt with one count of wire fraud, four counts of money laundering, and two counts of mail fraud. The jury found Pitt guilty of the mail-fraud charges but was unable to reach a verdict on the other charges.

Both mail-fraud counts (counts six and seven) alleged pecuniary fraud under § 1341 and honest-services fraud under § 1346, and the district court instructed the jury on the alternative theories of pecuniary fraud and honest-services fraud. Although it was error under <u>Skilling</u> to submit the honest-services theory to the jury, the question is whether "the jury [would] have still convicted [Pitt] had it not been told that in addition to the valid money/property fraud allegations, an allegation of honest services fraud could also be taken into consideration." <u>United States v. Segal</u>, 644 F.3d 364, 366 (7th Cir. 2011), <u>cert. denied</u>, 132 S. Ct. 1739 (2012). My review of the record convinces me beyond a reasonable doubt that the jury would have convicted Pitt of pecuniary mail fraud had the honest-services theory not been submitted to it.

The government's theory of the case was, in essence, that Pitt committed honest-services fraud as part of and in furtherance of his overarching plan to commit pecuniary fraud. <u>See</u> J.A. 1259-60 (arguing in closing that "Pitt violated his duty of honest services . . . and personally benefited from his position as chairman of the board. And that benefit was in the amount of $84,000 . . . . that the evidence shows went to Mr. Pitt and not the lower-income people of the city of Winston-Salem."); J.A. 1268-69 ("[F]ollow the money from HUD to the

38

Housing Authority to the $413,000 check to [EPD] that Mr. Trollinger testified he gave to Mr. Pitt to this check which goes directly to Mr. Pitt's bank. Follow the money."). As is apparent from the allegations in the indictment and the facts outlined above, the pecuniary fraud and honest-services fraud charges arose from and were premised on the same underlying set of facts -- Pitt's efforts to orchestrate the purchase of Lansing Ridge by HAWS for his own direct financial benefit. The government's evidence of fraud, therefore, was as applicable to the pecuniary fraud theory as it was to the honest-services theory. For example, evidence of the plan to have Trollinger, in his own name, buy Lansing Ridge at the foreclosure and immediately resell it to HAWS at a pre-determined and substantially higher price establishes a scheme to defraud under either theory, and Pitt's repeated failures to disclose his interest in Lansing Ridge to the Board and Trollinger's lies to the closing attorney about the ownership of EPD are material misrepresentations or concealments under either theory.[2] And as

---

[2] Although the Court in Skilling held that honest-services fraud does not encompass undisclosed conflict-of-interest cases, see 130 S. Ct. at 2932, Skilling does not preclude the prosecution under § 1341 of a conflict-burdened defendant who commits pecuniary fraud, nor does it somehow render evidence of an undisclosed conflict irrelevant or inadmissible in a § 1341 pecuniary fraud case. See, e.g., United States v. Joshua, 648 F.3d 547, 554 (7th Cir. 2011) (finding "nothing objectionable" (Continued)

to specific intent, which "may be inferred from the totality of the circumstances and need not be proven by direct evidence," United States v. Ham, 998 F.2d 1247, 1254 (4th Cir. 1993), the record is replete with supporting evidence relevant to either theory, not the least of which is Trollinger's unequivocal testimony that the purpose of buying the property in his name was "[t]o conceal Mr. Pitt's interest in the property." J.A. 720. Moreover, the critical evidence supporting the mail-fraud charges was effectively uncontroverted. Pitt did not testify or present other evidence directly contradicting the factual substance of the government's evidence. Although counsel for Pitt attempted to show through cross-examination that Pitt did not conceal his interest in the property and had no intent to defraud because his involvement with EPD was already known to the Board, the guilty verdicts show that the jury necessarily rejected that claim.

Accordingly, I believe that the largely uncontroverted evidence establishing honest-services fraud likewise established pecuniary fraud. I see nothing in that evidence, or in the government's arguments, or in the court's instructions, that could rationally lead to a conviction for honest-services fraud

about the use of the same evidence to support allegations of monetary fraud and honest-services fraud).

but an acquittal on pecuniary fraud.  See United States v. Skilling, 638 F.3d 480, 482 (5th Cir. 2011) (finding Yates error harmless after remand from Supreme Court and explaining that relevant inquiry is "whether the record contains evidence that could rationally lead to an acquittal with respect to the valid theory of guilt" (internal quotation marks and alterations omitted)), cert. denied, ___ S. Ct. ___, 80 U.S.L.W. 3358 (U.S. April 16, 2012); United States v. Black, 625 F.3d 386, 393 (7th Cir. 2010) (after remand from Supreme Court, finding Yates error harmless as to one count because "[n]o reasonable jury could have acquitted the defendants of pecuniary fraud on this count but convicted them of honest-services fraud"), cert. denied, 131 S. Ct. 2932 (2011).  Because the pecuniary fraud and honest-services fraud claims were so closely related and were premised on the same set of largely uncontroverted facts, I have no difficulty concluding that the error in submitting the honest-services theory to the jury was harmless beyond a reasonable doubt.  See Jefferson, 674 F.3d at 364 (finding Yates error harmless because the "alternative theories of liability were co-extensive").

Judge Gregory, however, seems to believe that the close relationship between the fraud counsels against a finding of harmlessness.  According to Judge Gregory, the government's case was always and only an honest-services-fraud case that focused

41

on Pitt's failure to disclose his interest in Lansing Ridge rather than on the money from the sale of the property. Judge Gregory minimizes the significance of the pecuniary fraud, asserting that the evidence showing that Pitt personally profited from the sale was offered "primarily as a motive to engage in honest-services fraud rather than as an independent theory of guilt." Opinion of Judge Gregory, slip op. at 13. While I agree that money from the sale of Lansing Ridge provided the motive for Pitt's fraud, I am puzzled by the view that Pitt's obvious pecuniary motive somehow makes it less likely that the jury would have convicted Pitt of pecuniary fraud.

Judge Gregory does not explain, nor is it apparent to me, why the interrelatedness of the theories makes the error harmful rather than harmless. The very formulation of the harmlessness inquiry -- whether the record contains evidence that could rationally lead to an acquittal with respect to the valid theory of guilt -- suggests that a close connection between the valid and invalid theories would make it more likely, not less likely, that the error would be harmless, as courts have often concluded. See, e.g., United States v. Rodrigues, ___ F.3d ___, 2012 WL 1001349 at *8-9 (9th Cir. Mar. 27, 2012) (agreeing with district court's analysis that Yates error was harmless because the same facts establishing the invalid honest-services theory likewise established that defendant received kickbacks);

*Jefferson*, 674 F.3d at 364 (*Yates* error harmless because alternative theories "were co-extensive"); *United States v. Coppolla*, 671 F.3d 220, 238 n.12 (2d Cir. 2012) (*Yates* error "harmless under any conceivable standard" where proof of the invalid theory "necessarily establishes the facts required to show" the valid theory).

I recognize, of course, that there are cases where the intertwining of the alternate theories might preclude a finding of harmlessness -- for example, where the jury instructions jumbled the theories in ways that the jury could not have sorted out, see *United States v. Riley*, 621 F.3d 312, 324 (3d Cir. 2010), or where the evidence supporting the invalid legal theory was strong but the evidence of the valid theory was weaker, see *Black*, 625 F.3d at 392 (*Yates* error not harmless as to one count where the evidence of pecuniary fraud was "not conclusive" but the evidence of honest-services fraud was "irrefutable"). In this case, however, the jury instructions did not mix concepts of pecuniary and honest-services fraud, and the evidence of pecuniary fraud was extremely strong. And in my view, it is the strength of that evidence and its relationship to the honest-services fraud evidence that makes the *Yates* error harmless.

At the same time that he finds the error not harmless because the fraud theories are too *related*, Judge Gregory also contends the error was not harmless because the theories are too

different.  Judge Gregory posits that a conviction for pecuniary fraud requires proof the defendant specifically intended to defraud another of a pecuniary interest, while a conviction for honest-services fraud requires proof of a specific intent to defraud another of the intangible right to honest services.  Because "an honest-service fraud conviction does not necessitate a pecuniary fraud conviction," Opinion of Judge Gregory, slip op. at 14, the jury's conclusion that "Pitt intended to defraud HAWS of its right to his honest services does not compel the conclusion that he also intended to deprive HAWS of a pecuniary interest," id., and the Yates error therefore cannot be harmless.

I am not entirely sure I understand this analysis.  Alternative theories of guilt are "alternative" because they differ from each other in some respect.  If an alternative-theory error can be harmless only if the alternate theories have identical elements proved through identical evidence, alternative-theory errors would never be harmless.

In any event, as previously discussed, the government's evidence established that the whole point of buying Lansing Ridge at the foreclosure sale was to immediately turn around and sell it to HAWS at a price high enough to protect Pitt's undisclosed financial interest in the property, and it is irrefutable that Pitt pocketed $84,000 of the HAWS-supplied

44

funds used to buy Lansing Ridge. While the instructions permitted the jury to convict Pitt of honest-services fraud even if HAWS did not suffer a loss, the instructions also explained that a defendant acts with intent to defraud by acting "knowingly and with the specific intent to deceive someone ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to oneself." J.A. 1339. The evidence demonstrated beyond question that HAWS in fact suffered a financial loss by paying an inflated price for property that is unsuitable for development as low-income housing and for which federal housing funds cannot be used to make suitable. In the face of this evidence, any reasonable jury concluding that Pitt intended to defraud HAWS of his honest services would also have found that he intended to defraud HAWS of money.

Judge Gregory and Judge Wynn in their separate opinions both distinguish the cases (discussed above) where Yates errors have been found to be harmless in the same manner. They note that while the jury here could not reach a verdict on the money-laundering charges, the juries in the above-discussed cases convicted the defendants of "additional and related charges [that] ameliorated the problem of the infirm honest services charge." Opinion of Judge Gregory, slip op. at 13; Opinion of Judge Wynn, slip op. at 23. An instructional error, of course,

45

can be found harmless even if the count affected by the error is the only count of which the defendant was convicted. And while a jury's decision to convict a defendant of other charges is relevant to the harmlessness inquiry, the same cannot be said about a jury's inability to reach a verdict. As this court recently explained when declining to consider hung-jury counts when determining whether a Skilling error was harmless, "[a] jury's 'failure to reach a verdict cannot -- by negative implication -- yield a piece of information that helps put together the trial puzzle.'" United States v. Hornsby, 666 F.3d 296, 305-06 n.4 (4th Cir. 2012) (quoting Yeager v. United States, 557 U.S. 110 (2009)).

> Unlike the pleadings, the jury charge, or the evidence introduced by the parties, there is no way to decipher what a hung count represents. . . . A host of reasons -- sharp disagreement, confusion about the issues, exhaustion after a long trial, to name but a few -- could work alone or in tandem to cause a jury to hang. To ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room. But that is not reasoned analysis; it is guesswork. Such conjecture about possible reasons for a jury's failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jurors did return.

Yeager, 557 U.S. at 121-22 (emphasis added; footnotes omitted). The harmlessness inquiry here requires us to determine whether a rational jury would have found Pitt guilty without the improper honest-services instruction; speculation about the meaning of

46

the jury's inability to reach a verdict on some counts should play no part in the analysis, see id. at 122.

## III.

As this court recently explained, "a reviewing court is not entitled to reverse a conviction that could rest on either a valid or invalid legal theory if the court can conclude beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." Jefferson, 674 F.3d at 361 (emphasis added; internal quotation marks omitted). After reviewing the record, I am convinced beyond a reasonable doubt that if the erroneous honest-services theory had not been submitted to the jury, the jury would have convicted Pitt of pecuniary fraud. Because the Yates error was harmless beyond a reasonable doubt, I respectfully dissent from the reversal of Pitt's convictions.